# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia ex rel. Joey K. Jeffery,**
**Petitioner Below, Petitioner**

**vs)  No. 17-0216** ( Kanawha County 15-P-338)

**Ralph Terry, Superintendent,**
**Mt. Olive Correctional Complex,**
**Respondent Below, Respondent**

**FILED**

**October 15, 2018**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Joey K. Jeffery, by counsel Matthew A. Victor, appeals the February 13, 2017, order of the Circuit Court of Kanawha County denying his petition for writ of habeas corpus. Respondent Ralph Terry, Superintendent, Mt. Olive Correctional Complex, by counsel Benjamin F. Yancey, III, filed a response in support of the circuit court's order.[1]

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

In February of 2014, petitioner was convicted of the kidnapping, second-degree robbery, malicious wounding, and assault of Leanne Quinn. In the early morning hours of December 8, 2012, petitioner and his girlfriend, Cindy Creathers, saw Ms. Quinn in a passing vehicle and reportedly observed a number of petitioner's personal items in Ms. Quinn's possession. Later that morning, petitioner confronted Ms. Quinn regarding the items and struck her in the face and stomach. Petitioner then forced Ms. Quinn into a vehicle and drove her to his home, where she was beaten with a bat and otherwise assaulted by petitioner and Ms. Creathers. Ultimately, petitioner drove Ms. Quinn to an isolated area where she was kicked, punched, forced to her knees, and a handgun was discharged near her head. Petitioner took Ms. Quinn's shoes and coat,

---

[1]Effective July 1, 2018, the positions formerly designated as "wardens" are now "superintendents." *See* W.Va. Code § 15A-5-3. At the time of the filing of this appeal, David Ballard was then warden at Mt. Olive Correctional Complex and, as such, was originally listed as the respondent below. However, the acting warden, now superintendent, is Ralph Terry. Accordingly, the Court has made the necessary substitution of parties pursuant to Rule 41(c) of the West Virginia Rules of Appellate Procedure.

and threatened to kill her children if she reported the incident and did not return his personal items

Upon her release from captivity, Ms. Quinn reported her kidnapping and assault to law enforcement. On March 28, 2013, a Kanawha County Grand Jury returned a multi-count indictment against petitioner and Ms. Creathers, for the felony offenses of kidnapping, malicious wounding, first-degree robbery, and assault during the commission of a felony. Before trial, pursuant to a plea agreement, Ms. Creathers pled guilty to conspiracy to commit robbery in the first-degree and agreed to testify against petitioner at trial. Prior to trial, petitioner's trial counsel moved the court to have petitioner evaluated for competency. A subsequent competency evaluation was completed and petitioner was determined to be competent to stand trial. Petitioner's trial began on February 10, 2014, and continued for three days.

On the first day of trial, the victim testified. Through her testimony, Ms. Quinn related the story of her kidnapping and assault at the hands of petitioner and Ms. Creathers. Following the direct testimony of Ms. Quinn, a juror approached the bench and had a short off-the-record discussion with the court, out of the hearing of the jury and without counsel or petitioner present, wherein a juror inquired as to the maiden surname of Ms. Creathers. The juror returned to his seat and the court called counsel to the bench, advised what inquiry had been made by the juror, and advised petitioner's counsel that he could "fully voir dire" the juror at a later point. After this conference, Ms. Quinn was cross-examined. Following the cross-examination, the jury was excused with the exception of the juror at issue. With the rest of the jury excused, petitioner's counsel, with petitioner present, questioned the juror who advised that he "did not have an extensive acquaintance with [Ms.] Creathers and that he would judge Ms. Creathers' credibility as with any other witness." Counsel and the court conferred following the voir dire and the juror was excused from further service. An alternate juror who had been previously impaneled continued to hear the case in the stead of the excused juror. No objections were made by either counsel.

On the second day of trial, the State continued the presentation of its case, which included the testimony of law enforcement representatives. As its final witness, the State called Ms. Creathers who testified regarding the occurrence of the underlying criminal incident. At some point in her testimony, it was brought to the trial court's attention that Ms. Creathers had not been sworn prior to testifying. Thereafter, Ms. Creathers was immediately sworn and was directly asked by the court if the testimony she had provided prior to being sworn was honest and truthful, to which she replied, yes. Ms. Creathers was given the opportunity by the court to change any of her testimony given prior to being sworn, but she noted there was no testimony she would change. No objection was made by either counsel.

Under cross-examination, Ms. Creathers advised that she struck Ms. Quinn once with a bat and threatened her with a knife. Ms. Creathers corroborated Ms. Quinn's testimony and, when asked about her motive for testifying against petitioner, Ms. Creathers stated she was testifying because it was the right thing to do.

At the beginning of the third and final day of trial, the court had an off-the-record discussion, outside of the presence of the jury and counsel, with Juror Hogan. Juror Hogan

advised the court that she had discovered a "confusing, distant familiarity with Ms. Quinn." Thereafter, without petitioner being present, a bench conference between the parties' counsel, the court, and Juror Hogan was held. During this conference, petitioner's counsel asked the juror if there was anything "that would cause you to not be able to fairly consider the evidence that's in front of you?" to which the juror replied, "No, there is not." Juror Hogan advised that she had not made any statements to her fellow jurors regarding her concerns. No objection was made by counsel.

The trial commenced and the defense called Tracy Campbell to testify. Mr. Campbell described a conversation that he had with Ms. Quinn wherein Ms. Quinn advised that she had thrown her shoes and coat at petitioner on the evening in question and cursed at him. Further, Mr. Campbell testified that Ms. Quinn never told him that petitioner struck or beat her on the evening in question. Thereafter the defense re-called Ms. Quinn to testify in an attempt to discredit her testimony, at the conclusion of which the defense rested.

During closing arguments, petitioner's counsel highlighted the inconsistencies between the testimony of Ms. Quinn and Ms. Creathers. After deliberations, the jury returned a verdict of guilty on all charges, with a recommendation of mercy as to the kidnapping charge. On April 9, 2014, petitioner was sentenced to four consecutive sentences of imprisonment. Petitioner filed a direct appeal of his conviction, which was affirmed by this Court in *State v. Jeffery*, No. 14-0888, 2015 WL 1740281, (W.Va. Apr. 13, 2015) (memorandum decision). On April 13, 2015, petitioner filed his initial petition for writ of habeas corpus. An amended petition was filed on petitioner's behalf on April 29, 2016.

An omnibus hearing on petitioner's amended petition for writ of habeas corpus began on November 7, 2016, and continued on December 6, 2017. During this hearing, petitioner asserted that his attorney had not communicated with him and had failed to review discovery or trial strategy with him. Petitioner advised that he had given the names of specific witnesses who would aid in his defense, but those witnesses were not called to testify at trial.

By order dated February 13, 2017, the circuit court denied petitioner's amended petition for a writ of habeas corpus. The court found that petitioner failed to explain how his counsel's alleged deficiencies affected the result of trial and, accordingly, did not violate the provisions of *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). The court noted that petitioner's trial counsel and his retained investigator met with petitioner on numerous occasions, discussed, and "investigated" the possibility of testimony from each of the witnesses suggested by petitioner, who petitioner's trial counsel alleged would have provided unfavorable or uncorroborated testimony or the individuals simply could not be located by counsel or his investigator.

The court found that none of the evidence cited by petitioner was erroneously admitted and found no basis for petitioner's petition for a writ of habeas corpus. It is from the circuit court's February 13, 2017, order that petitioner now appeals.

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion

3

standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex. rel. Franklin v. McBride*, 226 W. Va. 375, 701 S.E.2d 97 (2009).

On appeal, petitioner asserts seven assignments of error. First, petitioner argues that he received ineffective assistance of counsel. In his second and third assignments of error, petitioner contends that under a plain error analysis he was deprived of his due process right to a fair trial when the court engaged in communications with a juror; when he was absent for critical stages of the proceedings; and when the court failed to swear in a witness prior to her testimony. In his fourth, fifth, and sixth assignments of error, petitioner argues that under a plain error analysis the trial court's rulings regarding the admission of certain evidence at trial was improper. In his final assignment of error, petitioner argues cumulative error. Our review of the record supports the circuit court's decision to deny petitioner's petition for writ of habeas corpus as to each of petitioner's assignments of error. Petitioner's arguments presented herein, with the exception of the application of the plain error doctrine, were thoroughly addressed by the circuit court in its order denying petitioner habeas relief.

As to plain error, this Court has long held that the "'plain error' doctrine grants appellate courts, in the interest of justice, the authority to notice error to which no objection has been made." *Miller*, 194 W. Va. at 18, 459 S.E.2d at 129. To trigger the application of the plain error doctrine, there must be "(1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Id*. at syl. pt. 7, in part. We have further noted that the plain error rule should only be exercised to avoid a miscarriage of justice and reserved for correction of those few errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings." *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046 (1985). Here, after review, we find that under the limited facts and circumstances of this case the application of the plain error doctrine is not triggered. None of the alleged errors argued by petitioner affected the fairness, integrity, or public reputation of the judicial proceedings and did not result in a miscarriage of justice. Petitioner presented substantial evidence on his behalf at trial and competently cross-examined witnesses offered by the State. Further, the record reflects that petitioner was provided multiple opportunities to conduct voir dire of jurors and was personally involved in the critical stages of the proceedings. Accordingly, as there was no trigger of the plain error doctrine, the circuit court did not err.

The circuit court's order includes well-reasoned findings and conclusions as to the assignments of error now raised on appeal. Because we find no clear error or abuse of discretion in the circuit court's order or record before us, we hereby adopt and incorporate the circuit court's findings and conclusions as they relate to petitioner's assignments of error raised on appeal and direct the Clerk to attach a copy of the circuit court's February 13, 2017, "Final Order Denying Petition for Writ of Habeas Corpus" to this memorandum decision.

For the foregoing reasons, we affirm the circuit court's denial of petitioner's amended petition for habeas corpus.

4

                                                                Affirmed.

**ISSUED:**  October 15, 2018

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Paul T. Farrell sitting by temporary assignment
Justice Tim Armstead
Justice Evan H. Jenkins

Justice Allen H. Loughry II suspended and therefore not participating

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

2017 FEB 13 PM 4: 50

STATE OF WEST VIRGINIA
ex rel. JOEY K. JEFFERY,

    *Petitioner,*

v.                           15-P-338 (13-F-223)
                                  JUDGE TOD J. KAUFMAN

DAVID BALLARD, WARDEN,
MOUNT OLIVE CORRECTIONAL COMPLEX,

    *Respondent.*

## FINAL ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Pending before this Court is the petitioner's amended petition for writ of habeas corpus. Following a review of the entire underlying criminal file; a review of the amended petition and supporting memorandum of law, and the response; a review of the testimony and argument from the omnibus evidentiary hearing, as well as an examination of the pertinent law, this Court makes the following findings of fact, conclusions of law and final order.

## FINDINGS OF FACT

1. A multi-count indictment charged the petitioner and Cindy Creathers with the felony offenses of kidnapping of Leanne Quinn, the malicious wounding of Quinn, first degree robbery of Quinn, and assault during the commission of a felony of Quinn.

2. Before trial, pursuant to a plea agreement, Creathers pled guilty, by way of information, to the felony offense of conspiracy to commit robbery in the first degree. (Case No. 13-F-541(I)).

1

3. Counsel for the petitioner moved the Court to have his client evaluated for criminal responsibility and competency. (Order granting the motion filed September 4, 2013, 13-F-223 Docket Line 82.)

4. The evaluation was performed and the report sealed. (Docket Line 107.) At a status conference held December 16, 2013, the assistant prosecutor noted that the report had been received and that "He's found competent and criminally responsible." (Hearing Transcript, 12/16/13 at 6.)

5. The court confirmed that it had "reviewed the matters contained in the report and that Mr. Jeffery's is competent to stand trial." (Id. at 7.)

6. Leanne Quinn, the victim, testified that she knew the petitioner "really well" for as far back as she could remember. (Id. at 212.) She described their relationship as "close" and indicated that she lived with him on and off.

7. However, on December 8, 2012, Ms. Quinn indicated that the petitioner was romantically involved with the co-defendant, Creathers. (Id. at 213-14.) The three of them checked into the Knights Inn that night. (Id. at 214.) The three used drugs at the motel, but Ms. Quinn decided to leave. She called her children's father for a ride. (Id. at 214.)

8. Ms. Quinn left the motel and went to the home of Erika Hancock. (Id.)

9. Ms. Quinn next saw the petitioner at that residence. The petitioner punched her in the face and stomach demanding to know where his "stuff" was. (Id. at 217.) The petitioner grabbed her by the hair and forced her into his truck. (Id. at 218.)

10. The petitioner took the victim to his trailer, where he laid trash bags on the floor, forced the victim to lay on them and beat her with a bat, and threatened her with an ax. The

2

petitioner became angry because Ms. Quinn was bleeding "everywhere." (Id. at 220.) The petitioner shocked her with an electric cord and stuck her with a needle.

11. At some point, Ms. Quinn was placed in the truck and was driven by the petitioner and Creathers to the residence of Junior Woolwine. (Id. at 228.) Ms. Quinn remembered asking Woolwine, her uncle, for help and him refusing. (Id. at 229.)

12. Ms. Quinn testified she had told another relative that Kevin and Erika had been the ones who harmed her, but had said that only because she was still in the custody of the petitioner and being threatened by Creathers. (Id. at 233.)

13. The three drove to the top of Witcher Creek. There the petitioner kicked her and punched her some more, and took her rings, coat and shoes. He threatened to kill her children and threatened her with the gun. (Id. at 235-36.) The petitioner shot the gun once beside her head. (Id. at 238.)

14. After the victim was released she eventually went to the police. There, photographs were taken of her and her clothing. Ms. Quinn identified a cut on her forehead, blood on her hands, blood on the shirt she was wearing, and blood on the pants she was wearing. The photographs were also displayed for the jury. (Id. at 247-48.)

15. She had cuts on her neck and a black eye and busted mouth.

16. A juror approached the judge at the bench. The judge then immediately informed counsel at the bench that the juror had asked him what Creathers' maiden name was.

17. Ms. Quinn acknowledged that she was so high that she might not remember talking to individuals, or what she might have said to them. (Id. at 263-64.) She ingested both meth and Xanax. (Id. at 264.)

3

18. Ms. Quinn denied using more drugs after she left the motel room because she was "already high" (id. at 266) but admitted going to the petitioner's trailer and entering it. (Id. at 267.)

19. Ms. Quinn acknowledged that the petitioner never touched her with a knife and that she was not injected with any foreign substance. (Id. at 271.) She also acknowledged she had no broken bones. (Id. at 272.)

20. After testimony finished for the day, and the rest of the jury was excused, in the presence of the petitioner, the juror who had approached the bench stated that he knew Ms. Creathers by her maiden name. (Id. at 278.) The juror did not have extensive acquaintance and stated that he could judge her credibility as with any other witness. (Id. at 280.)

21. The judge determined to excuse the juror while the petitioner was present. Petitioner and his counsel did not object. (Id. at 288.) An alternate juror, who was previously empaneled, continued to hear the case. A full jury of twelve qualified jurors heard the entire case and deliberated on the unanimous verdict rendered.

22. Mike Phantom of 911 regularly pulled records for court, including calls recorded during the normal course of business. There are procedures in place to ensure that the calls are accurately recorded. (Id. at 307.) Defense counsel objected to the content of the calls as hearsay. (Id. at 310.)

23. Trooper Ward of the West Virginia State Police had been informed to look out for a vehicle in reference to a kidnapping. (Id. at 313.)

24. He encountered Cindy Creathers and the petitioner at the Knight's Inn, although Ms. Creathers claimed that her name was "Leanne." (the victim) (Id. at 319-20.)

4

25. The officer entered the hotel room to look for the real Leanne, the victim, fearing she had been harmed or needed assistance.

26. He observed bloody items, left the room, and applied for and received a search warrant. He recovered shoes and clothing with what appeared to be blood on them. (Id. at 321-22). A search warrant was obtained for the petitioner's truck and home. Blood was observed in both locations. (Id. at 323; 325.) Knives were also found at those locations.

27. Trooper Cervera recovered certain items of evidence including pants and jeans that appeared to have blood on them. (Id. at 354.)

28. Crystal Workman, an expert in DNA analysis, determined that the victim's blood was on a bat recovered from the petitioner's residence. (Id. at 379.) Her blood was also found on the petitioner's living room rug. (Id. at 380.) Her blood was also found in other areas of the trailer and in the truck. (Id. 381-83.)

29. Cindy Creathers testified for the state pursuant to the plea agreement by which she pled guilty to conspiracy to commit robbery. (Id. at 405.)

30. Ms. Creathers testified that "they" borrowed a truck from Junior Woolwine to go to the Knight's Inn-the truck later searched by the police. (Id. at 410.) It is unclear who rented the room the first night; Ms. Quinn took money from the petitioner and paid for the second night.

31. Ms. Quinn left the motel about midday on December 7. (Id. at 411-12.)

32. In the very early morning hours of December 8, the petitioner and Ms. Creathers left the motel to check on his house. (Id. at 413.) Ms. Creathers was driving the truck and on the road encountered the victim and Erika Hancock in another vehicle. (Id. at 415.) According to Ms. Creathers, personal items from the petitioner's residence were in the Hancock vehicle including a coin jug, televisions and tools. The petitioner became angry. (Id. at 416.)

5

33. Ms. Quinn approached the petitioner; however, instead of engaging in conversation the petitioner hit her with his fist in the face. (Id. at 418.)

34. The petitioner "kind of" pushed the victim into the truck, handed Creathers a small knife and said "if she moved to cut her." (Id. at 421.) The petitioner, at his trailer, grabbed the victim by her hair, pushed her to the floor, and kicked her in the head. (Id. at 423-24.) After kicking her repeatedly, the petitioner shocked the victim with an electric cord. (Id. at 428.) The petitioner took the victim's jewelry and hit at her hands and feet with an ax handle. (Id. at 429.)

35. It was brought to the court's attention that Ms. Creathers had not been sworn. She was sworn and the following exchange occurred:

THE COURT: Questions have been asked of you for the last 50 minutes since you have come in here, have every one of your questions been honest and truthful, as you are now under oath?

THE WITNESS: Yes, sir.

THE COURT: Is there any answer to any of your questions that you would change, having given that prior to this oath being administered that are now asked of you, if you were under oath?

THE WITNESS: No, sir.

36. Ms. Creathers described the victim's hands as cut and bloodied, and that she had bled heavily from her face. (Id. at 444-45.) She observed the petitioner inject a needle into the victim, and heard him tell her it was brake fluid and bleach. (Id. at 448.)

37. Ms. Creathers corroborated the victim's testimony that the victim's uncle, Dorsey Woolwine refused to help her when they drove there on the way up to Witcher Creek.

38. In fact, according to Creathers, Woolwine gave petitioner a gun. (Id. at 457.) She saw the petitioner force the victim to her knees and fire a gun past her head. (Id. at 460.)

6

39. After the petitioner took the victim's shoes and coat, and told her to run, Creathers and the petitioner returned to Woolwine's where the petitioner apparently returned the gun. (Id. at 461-62.)

40. The petitioner and Creathers returned to the Knight's Inn. Ms. Creathers identified photos taken in the motel room as the victim's coat and the shoes she was wearing that night. (Id. at 468.) Ms. Creathers testified that police arrived shortly thereafter. The police knocked on the door and the petitioner let them in to check the room. The petitioner was then taken outside the room. (Id. at 470.)

41. On cross-examination, petitioner's counsel immediately pointed out that Ms. Creathers was receiving a huge benefit in reduction of charges in agreeing to testify against the petitioner. (Id. at 474.)

42. Ms. Creathers said that she was romantically involved with the petitioner, and stated that the victim was involved with the petitioner "romantically" and that sometimes the three of them were involved. (Id. at 478.) Ms. Creathers corroborated the victim's account that the three were doing drugs, including meth. (Id. at 479.)

43. On cross-examination, petitioner's counsel was successful in obtaining an admission that Ms. Creathers had hit the victim with a bat.

44. Further, Creathers said the victim was lying if she said Creathers cut her with a knife. (Id. at 486-87.)

45. The defense proffered a witness who testified that the victim had related to him that she had thrown her own shoes and coat at the petitioner. (Id. at 534.) The victim never stated that the petitioner hit her, but stated that Creathers did and that they "got into one hell of a fight." (Id. at 539.)

7

46. In closing argument, the petitioner's trial counsel effectively noted that the photographs showed only the victim's hand with a bandage, but there was no corroborating medical evidence or photographs of the alleged burn. (Id. at 607.)

47. Additionally, he pointed out the absence of other evidence such as the gun the petitioner allegedly used. He pointed out inconsistencies between the victim and Creathers. (Id. at 608-09.)

48. The jury found the petitioner guilty of kidnapping, with a recommendation of mercy; malicious wounding, second degree robbery and assault during the commission of a felony. 51. At disposition, the court imposed the statutorily required sentences for each of the offenses, and ordered those terms to be served consecutively.

49. The petitioner filed a direct appeal. The issues proffered as error on appeal all involved the testimony of Creathers. The West Virginia Supreme Court affirmed his convictions and sentence in a memorandum decision, *State v. Jeffery*, 2015 WL 1740281, Memorandum Decision in 14-0888, issued April 13, 2015.

50. Now the petitioner files a petition for writ of habeas corpus, and with the assistance of counsel filed a *Losh* list and amended petition.

51. The issues brought forward by the petitioner in his amended petition for writ of habeas corpus include, *inter alia*: Ineffective assistance of counsel in failing to move to suppress evidence seized from the hotel room, petitioner's truck or residence; failing to obtain a pre-trial evaluation for competency or criminal responsibility; failing to effectively cross-examine the victim; failing to obtain surveillance tapes of the motel and other property; failing to include the client in bench conferences; failing to present a promised defense; failing to object to

8

"bolstering" of the co-defendant; failing to object to testimony regarding drug dealing; failing to effectively cross-examine another witness; and failing to object to the 911 call.

52. The petition further asserts as error of constitutional dimension over and above ineffective assistance of counsel: that the trial court held an ex parte communication with a juror, and further held bench conferences in the petitioner's absence. Additionally, the petitioner asserts as error that a witness was not sworn before her testimony but during and merely "affirmed" her unsworn testimony. The petitioner states that evidence seized from the motel premises, the petitioner's truck and the petitioner's residence should have been excluded as being obtained by a warrantless search or as "fruit of the poisonous tree." The petitioner asserts that the state improperly bolstered the testimony of the co-defendant by asking her why she was testifying. The petitioner further states that admission of the 911 tape, references to "bloody" clothing, and testimony about the petitioner's drug dealing and possession of drugs at his home was error.

53. An omnibus evidentiary hearing was held over the course of two days, November 7, 2016 and December 6, 2016.

54. The petitioner asserted, generally, that his attorney had not communicated with him and had never reviewed the discovery in the case with him. (Id. at 10-11.)

55. The petitioner said his attorney never discussed trial strategy with him. (Id. at 12.)

56. The petitioner asserted he had given specific names of witnesses who would assist in his defense, but that those persons were not called at trial. (Id. at 17-18.)

57. A significant portion of petitioner's omnibus hearing testimony dealt with strategic matters about what he believed his counsel should or should not do. The Court must

9

note, however, that petitioner fails to explain how his counsel's alleged failure to do those things affected the result of the trial. (Id. at 27-36.)

58. The petitioner acknowledged he was evaluated by a psychiatrist and found competent to stand trial. (Id. at 40.)

59. The petitioner acknowledged that although convicted of kidnapping, the jury recommended mercy, meaning he was eligible for parole at a future date. He further acknowledged that the jury could have withheld a recommendation of mercy, rendering him ineligible for parole. (Id. at 42.)

60. The petitioner acknowledged that although he was indicted for first degree robbery and subject to a sentence without any upper limits, he was convicted of second degree robbery which carries a sentence of five to eighteen years. (Id.)

61. Trial counsel for the petitioner engaged the services of an investigator. (Omnibus hearing transcript, December 6, 2016, at 5.)

62. rial counsel personally met with the petitioner on numerous occasions; the investigator also met separately with the petitioner. (Id.)

63. Trial counsel made a motion to have his client evaluated; the petitioner was found both competent and criminally responsible. Counsel did not move for a competency hearing after that.

64. As to the failure to call witnesses, including each and every name mentioned at the previous hearing, counsel and/or his investigator investigated the possibility of testimony from each and every name proffered to them by the petitioner. (Id. at 11.)

10

65.     Generally, as to every name proffered by the petitioner as a "favorable" witness, the results were the same: the testimony actually would have been unfavorable, uncorroborated, or the individuals simply couldn't be found. (Id.)

66.     The court will note that there is no evidence of record to demonstrate that such surveillance video actually existed or was available at trial, or had anything material on them. No such tapes were proffered at the omnibus hearing.

67.     As to the issue of suppressing evidence from the truck the petitioner was driving, the evidence obtained by search warrant from petitioner's trailer, and the evidence from the motel room, counsel explained that in large measure all the items corroborated the defense theory about the three individuals partying. Moreover, he believed it was futile to challenge the search of the truck as the petitioner did not own the truck. The petitioner, equally, did not rent the motel room. (Id. at 12-13.)

68.     As to the evidence from the trailer, the co-defendant admitted that she had struck a blow or blows on the victim at the trailer. (Id. at 13.)

69.     Counsel and his investigator spent an adequate time investigating the case. (Id.)

70.     Counsel spent the necessary amount of time with his client developing and discussing trial strategy. (Id. at 15.)

71.     In further explanation of uncalled witnesses, trial counsel agreed with the assertion that there were witnesses who couldn't be found, who were uncooperative, and who did not sustain what petitioner said they would say. (Id. at 20.)

72.     At least two witnesses who were subpoenaed by the defense appeared at trial and disavowed the information they had previously given to the investigator. (Id. at 20-21.Petitioner

11

believed that his investigator met with every individual whose name was supplied by the petitioner. (Id. at 21.) Still, none were cooperative. (Id. at 22)

73. Trial counsel's recollection was that the only bench conferences in which the petitioner did not participate involved logistics such as scheduling or bathroom breaks. (Id.)

## CONCLUSIONS OF LAW

74. Jurisdiction and venue are appropriately in the Circuit Court of Kanawha County, pursuant to Rule 3 of the West Virginia Rules Governing Post-Conviction Habeas Corpus Proceedings in West Virginia.

75. West Virginia Code §53-4A-1 provides for post-conviction habeas relief for "[a]ny person convicted of a crime and incarcerated under sentence of imprisonment therefor who contends that there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the Constitution of this State or both. . ."

76. The contentions and the grounds in fact or law must "have not been previously and finally adjudicated or waived in the proceedings which resulted in the conviction and sentence, or in a proceeding or proceedings in a prior petition or petitions under the provisions of this article, or in any other proceeding or proceedings which the petitioner has instituted to secure relief from such conviction or sentence." West Virginia Code §53-4A-1.

77. West Virginia's post-conviction habeas corpus statute "clearly contemplates that [a] person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one post-conviction habeas corpus proceeding." Syl. Pt. 1, *Markley v. Coleman*, 215 W.Va. 729, 601 S.E. 2d 49 (2004) (citations omitted). Such proceeding gives the Petitioner an opportunity to "raise any collateral issues which have not previously been fully and fairly litigated." *Coleman* at

12

732, 601 S.E.2d at 52. The initial habeas corpus hearing is *res judicata* as to all matters raised and to all matters known or which, with reasonable diligence, could have been known. Syl. Pt. 2, *Coleman, supra.*

78.    The habeas corpus statute "contemplates the exercise of discretion by the court." *Perdue v. Coiner,* 156 W. Va. 467, 194 S.E.2d 657 (1973).

79.    The circuit court denying or granting relief in a habeas corpus proceeding must make specific findings of fact and conclusions of law relating to each contention raised by the petitioner. *State ex rel. Watson v. Hill,* 200 W. Va. 201, 488 S.E.2d 476 (1997).

80.    "Habeas corpus proceedings are civil proceedings. The post-conviction habeas corpus procedure provided for by Chapter 85, Acts of the Legislature, Regular Session, 1967, is expressly stated therein to be 'civil in character and shall under no circumstances be regarded as criminal proceedings or a criminal case.'" *State ex rel. Harrison v. Coiner,* 154 W. Va. 467, 476, 176 S.E.2d 677, 682 (1970). The burden is on the petitioner to prove his claims by a preponderance of the evidence.

81.    "A habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed." Syl. Pt. 4, State *ex rel. McMannis v. Mohn,* 163 W. Va. 129, 254 S.E.2d 805 (1979). Moreover, "[t]he sole issue presented in a habeas corpus proceeding by a prisoner is whether he is restrained of his liberty by due process of law." Syl. Pt. 1, *State ex rel. Tune v. Thompson,* 151 W. Va. 282, 151 S.E.2d 732 (1966).

82.    A circuit court having jurisdiction over habeas corpus proceedings has broad discretion in dealing with habeas corpus allegations. *Markley, supra* at 733, 601 S.E.2d at 53.

10.    When determining whether to grant or deny relief, a circuit court is statutorily

13

required to make specific findings of fact and conclusions of law relating to each contention advanced by the petitioner and to state the grounds upon which each matter was determined. Syl. Pt. 4, *Markley, supra. See also* W.Va. Code §53-4A-3(a).

83. The petitioner has knowingly, voluntarily, and understandingly raised certain issues as enumerated above, and knowingly, voluntarily, and understandingly waived all other issues.

84. Claims of ineffective assistance begin and in large measure end with the standards set forth in *Strickland/Miller.*

85. West Virginia evaluates an ineffective assistance of counsel claim under the two-prong standard set forth by the Supreme Court of the United States in *Strickland v. Washington.* Syl. Pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E. 2d 114 (1995) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). To succeed on such a claim, a petitioner must establish that: 1) his trial counsel's "performance was deficient under an objective standard of reasonableness; and 2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." (*Id.*) "Failure to meet the burden of proof imposed by either part of the *Strickland/Miller* test is fatal to a habeas petitioner's claim." *State ex rel. Vernatter v. Warden, W. Virginia Penitentiary*, 207 W. Va. 11, 528 S.E. 2d 207 (1999).

86. The *Strickland* standard is not easily satisfied. *See Miller*, 194 W. Va. at 16 ("[T]he cases in which a defendant may prevail on the ground of ineffective assistance of counsel are few and far between."), *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 319, 465 S.E. 2d 416, 421 (1995)(ineffective assistance claims are "rarely" granted and only when a claim has "substantial merit"), *see also, Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005)("Petitioners claiming ineffective assistance of counsel under *Strickland* have a heavy burden of proof.").

14

87.    In *Miller*, the court outlined the challenge faced by a petitioner claiming ineffective assistance, noting that judicial review of a defense counsel's performance "must be highly deferential" and explaining that there is a strong presumption that "counsel's performance was reasonable and adequate." *Miller*, 194 W.Va. at 16, 459 S.E.2d at 127. Moreover, the *Miller* court held that there is a "wide range" of performance which qualifies as constitutionally-adequate assistance of counsel, stating:

> A defendant seeking to rebut th[e] strong presumption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a 'wide range.' The test of ineffectiveness has little or nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue

*Id.*, *see also Vernatter*, 207 W. Va. at 17, 528 S.E.2d at 213 ("[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . .'") (quoting *Strickland*, 466 U.S. at 689).

88.    A petitioner claiming ineffective assistance must identify the specific "acts or omissions" of his counsel believed to be "outside the broad range of professionally competent assistance." *See Miller*, 194 W. Va. at 17, 459 S.E.2d at 128, *State ex rel. Myers v. Painter*, 213 W. Va. 32, 35, 576 S.E.2d 277, 280 (2002)("The first prong of [the *Strickland*] test requires that a petitioner identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment)(internal quotation marks omitted).

89.    The reviewing court is then tasked with determining, "in light of all the circumstances" but without "engaging in hindsight," if that conduct was so objectively unreasonable as to be constitutionally inadequate. *Miller*, 194 W. Va. at 17, 459 S.E.2d at 128.

15

90.	Strategic choices and tactical decisions, with very limited exception, fall outside the scope of this inquiry and cannot be the basis of an ineffective assistance claim. *Legursky*, 195 W. Va. at 328, 465 S.E.2d at 430 ("A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness.")(internal quotation marks omitted), *Miller*, 194 W. Va. at 16, 459 S.E.2d at 127 ("What defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.").

91.	Identifying a mere mistake by defense counsel is not enough. *See Edwards v. United States*, 256 F.2d 707, 708 (D.C. Cir. 1958) ("Mere improvident strategy, bad tactics, mistake, carelessness or inexperience do not . . . amount to ineffective assistance of counsel, unless taken as a whole the trial was a 'mockery of justice.'"). As the *Miller* court noted, "with [the] luxury of time and the opportunity to focus resources on specific facts of a made record, [habeas counsel] inevitably will identify shortcomings in the performance of prior counsel;" however, the court continued, "perfection is not the standard for ineffective assistance of counsel." *Miller*, 194 W. Va. at 17, 459 S.E.2d at 128.

92.	There exists a rebuttable presumption that petitioner intelligently and knowingly waived any contention or ground in fact or law relied on in support of his petition for habeas corpus which he could have advanced on direct appeal but which he failed to so advance. The burden of proof rests upon the petitioner to rebut that presumption. Syllabus Pts 1 and 2, in paraphrase, *Ford v. Coiner*, 156 W. Va. 362, 196 S.E.2d 91 (1972).

93.	The petitioner claims that the state improperly bolstered the testimony of Cindy Creathers by eliciting from her on direct examination that she was testifying because she wanted,

16

in paraphrase, to clear her conscience. This issue was addressed in the memorandum decision of *Jeffery, supra,* which noted that:

> The record establishes that petitioner attacked the co-defendant's character for truthfulness during opening statements by indicating hi intention to call one of the codefendant's jail mates to testify "as to what really happened." "The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Because petition attacked his co-defendant's character for truthfulness first, we do not find that the circuit court abused its discretion in admitting evidence of the co-defendant's character for truthfulness.

*State v. Jeffery,* 2015 WL 1740281 at *3. (2015).

The West Virginia Supreme Court has already decided that there was no improper bolstering of Ms. Creathers' testimony. No testimony was proffered at the habeas hearing regarding this issue.

94. During trial, a juror became concerned that he had knowledge about one of the witnesses in the matter and approached the bench. The trial court recounted the conversation he had with the juror, and fully and completely informed counsel of the situation.

95. Counsel was given the opportunity to further explore the situation. The petitioner does not assert that he was harmed by the conversation, merely that he was not present.

96. This issue--communication between the court and a juror--is a contention which could have been, but was not, raised on direct appeal. Therefore, the presumption now exists that the petitioner has waived this issue. *Ford, supra.*

97. After the conversation about which the judge informed the parties, counsel was given the opportunity to inquire further. The court told the juror and the lawyers that he wanted them to ask any questions of the juror they wished. Defense counsel availed himself of this opportunity and clarified that there was nothing that "would cause you to not be able to fairly

17

consider the evidence that's in front of you?" (Trial Transcript at 526.) The juror affirmed impartiality, and the trial proceeded.

98. The petitioner's right to be present at all critical stages of his proceeding was not violated. "A critical stage in the criminal proceeding is one where the defendant's right to a fair trial will be affected." *State v. Boyd*, 160 W. Va. 234, 246, 233 S.E.2d 710, 719 (1977.)

99. The United States Supreme Court has held that the defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a right to have the conversation recorded. *Rushen v. Spain*. 474 U.S. 114 (2013).

100. Counsel was given the opportunity to inquire further, and in fact did inquire further. This matter is virtually identical to *State v. Pitts*, 2014 WL 5311400 (2014) in which a juror approached the trial judge because the juror believed he knew a person referenced in the evidence at trial. The conversation between the judge and juror was in private, but recorded. After the meeting the court apprised the parties of the situation and counsel had the opportunity to make further inquiry. The Supreme Court found no harm in the private meeting between the court and the juror, and determined even if improper, the petitioner was not prejudiced. That is precisely the situation in the case at bar.

101. The petitioner had no constitutional right to be present at the conversation between the judge and the juror. If he had, his failure to be present was harmless beyond all reasonable doubt.

102. The absence of a defendant from a critical stage of his trial implicates both State and Federal constitutional rights. However, the Court determines that this was not a critical stage in the proceedings. If it were, however, the Court further determines that the petitioner's absence from the brief conversation was harmless beyond a reasonable doubt. . . "In a criminal

18

proceeding, the defendant's absence at a critical stage of such proceeding is not reversible error where no possibility of prejudice to the defendant occurs." Syl. Pt. 3., *State ex rel. Redman v. Hedrick*, 185 W. Va. 709, 408 S.E.2d 659 (1991).

103.    Any error in the exclusion or voluntary absence of this petitioner from bench conferences was harmless beyond any reasonable doubt.  The petitioner states that he was excluded but does not even argue how he was harmed by his absence save for the conclusory statement that his right to a fair trial was affected.  The petitioner also had failed to demonstrate that he was in any way prejudiced by his absence from some conferences at which routine scheduling matters were discussed.

104.    In *State v. Ward*, 185 W. Va. 361, 407 S.E.2d 365 (1991) the petitioner was not present in chambers when the scope of redirect examination of a witness was discussed and neither the petitioner nor his attorney were present at a hearing on a motion to withdraw, which the court decided on the merits.  The court found no harm in the absence in those proceedings noting that the stages were non-critical, and even if critical, could be regarded as harmless error.

105.    The petitioner was not harmed by the procedure which the Court adopted after it was discovered Creathers had not been sworn before her testimony.  The Court had the witness sworn and had her acknowledge that none of her answers to any of the questions posited would change after she was placed under oath.  She was still on the stand, was sworn mid-testimony, and then affirmatively adopted the testimony she had given before being sworn and stated that she would not change any of the previously given testimony.

106.    The purpose of the oath or affirmation is to awaken the witness' conscience and impress his mind with the duty to tell the truth.  W. Va. R. Evid. 603.  "The admission of unsworn testimony is a mere irregularity and not a jurisdictional defect . . ." Syl. Pt. 3, in part, *In re*

19

*Simmons Children* 154 W. Va. 491, 177 S.E.2d 19 (1970.) Moreover, the irregularity may be corrected upon objection by having the witness sworn. *Simmons* at 496. 177 S.E.2d at 24.

107. It was not error for the Court to admit at trial, the items of physical evidence found in the truck the petitioner was driving—which was not his truck; the motel room in which the three stayed—which the petitioner did not rent; and the petitioner's trailer. Additionally, the failure to move to suppress those items was not ineffective assistance of counsel.

108. As to the search of the hotel room, the testimony at trial was that when the police knocked on the door, the petitioner invited them in. Therefore, they were legally in the room. Later, Trooper Ward entered the room, after being lied to by Creathers, to ensure the safety and welfare of the real victim.

109. The "emergency" doctrine is an exception to the warrant requirement. That doctrine, which is related to the doctrine of exigent circumstances provides that a limited, warrantless search may be performed where there is immediate need for police assistance in the protection of human life, the entry is motivated by the emergency, and there is a reasonable connection between the emergency and the area in question. *State v. Cecil*, 173 W. Va. 27 at 32, 311 S.E.2d 144 at 149 (1983). Specifically, in *Cecil*, the Supreme Court affirmed a warrantless search of a home where the record indicated that the police officers were attempting to locate an injured or deceased child.

110. The record in this case indicates clearly that the petitioner invited police officers into the room, and that Trooper Ward entered the room only to check on the well-being of the victim, whom he had reason to believe might be in the room. Upon his observation that Ms. Quinn was not present and further observing bloody items, he applied for a search warrant.

20

111.   Both sets of officers were legally in the room.  The search was not unreasonable. As the petitioner's brief complains about the search of the residence only insofar it was "fruit of the poisonous tree", since the tree was perfectly healthy, the search warrant was valid.  No evidence was seized in contravention of petitioner's constitutional rights.

112.   However, the evidence seized and presented to the jury actually bolstered petitioner's defense.  The only DNA found other than the victim's belonged to Creathers.  That fit perfectly with petitioner's contention that Creathers was the prime, if not sole, mover in the criminal events. Petitioner cannot satisfy either prong of *Strickland/Miller* as to this contention. Counsel was not ineffective in failing to move to suppress, as the items were clearly admissible.

113.   The testimony at the omnibus hearing from trial counsel was that the petitioner did not own the truck nor rent the motel room, and therefore lacked standing to object to those searches.  Trial counsel explained that he did not have a good faith basis for objecting to the searches of those premises.  As to the items taken from the trailer, the DNA results actually supported the defense theory that the petitioner was "merely present" and that Creathers was the primary, if not sole, offender.

114.   Separate from an assertion of ineffective assistance of counsel, the petitioner asserts that the admission of the 911 tape, references to bloody clothing and testimony about the petitioner's drug dealing and possession of drugs was error.  These contentions could have been, but were not, asserted in the petitioner's appeal.  The petitioner did not rebut the presumption that those contentions were knowingly and intelligently waived.  Therefore, they afford no basis for relief.  *Ford, supra.*  Additionally, a petition for writ of habeas corpus is not a substitute for appeal in that ordinary trial error will not form the basis for relief. *McMannis, supra.*  Further, the admission of evidence, even the erroneous admission of evidence, does not rise to the level of

21

error of constitutional dimension. The erroneous admission of evidence is analyzed under the abuse of discretion standard.

115. "'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.'" *State v. Louk*, 171 W.Va. 639, [643], 301 S.E.2d 596, 599 (1983)." Syl. Pt. 2, *State v. Peyatt*, 173 W. Va. 317, 315 S.E.2d 574 (1983).' Syl. Pt. 1, *State v. Shrewsbury*, 213 W. Va. 327, 582 S.E.2d 774 (2003)." Syl. pt. 1, *State* v. *Kaufman*, 227 W. Va. 537, 711 S.E.2d 607 (2011). Syl. Pt. 5, *State v. Davis*, 232 W. Va. 398, 752 S.E.2d 429 (2013). Rulings on the admission of evidence do not rise to the level of error of constitutional dimension.

116. The Court does not believe that any of the evidence cited by petitioner was erroneously admitted. The Court deems this contention to be waived by not being pled on direct appeal. The Court additionally notes that this claim implicates only ordinary trial error, and not error of constitutional dimension and is not cognizable in habeas. This contention affords the petitioner no relief.

117. The remainder of petitioner's contentions, save for cumulative error, all involve asserted instances of ineffective assistance of counsel, which, as noted above would, if proven, implicate both state and federal constitutional rights. As has been addressed above, and will be addressed below, the Court finds that trial counsel was not ineffective. Counsel committed no acts or omissions which were objectively deficient; petitioner cannot demonstrate that the result of the trial would have differed had trial counsel acted differently.

118. The petitioner claimed he was not evaluated before trial for competency or criminal responsibility. That is incorrect. Even the petitioner, at the omnibus hearing, acknowledged he had been evaluated. The record in this matter demonstrates that trial counsel

22

requested, and the Court ordered a competency evaluation. The record further unequivocally demonstrates that the evaluation's findings were that the petitioner was both competent and criminally responsible. Therefore, counsel acted in an objectively reasonable manner by requesting the evaluation. Counsel was not ineffective in this regard.

119.    It was not ineffective assistance of counsel to fail to follow up on a motion to have co-counsel appointed. Counsel was effective in his representation of the petitioner at trial. No co-counsel was necessary. The petitioner fails to demonstrate that a motion for co-counsel would have been granted, if pursued. Equally, the petitioner has failed to suggest what a second lawyer could have done, would have done, or should have done, differently than trial counsel did. The petitioner has failed to demonstrate that the results of the trial would have differed if co-counsel had been appointed.

120.    The petitioner has the right to be represented by effective counsel; he does not have the right to be represented by any more than one effective counsel, even in capital cases.

121.    As to trial counsel being ineffective for failing to obtain surveillance tapes, the petitioner failed to demonstrate at the habeas hearing that surveillance tapes existed at the time of the offense, either at the Woolwine property, an Exxon station, or the motel. Even if one assumes that such tapes did exist, the Court is not convinced that the petitioner adequately informed either counsel or his investigator that such evidence might be available. Most importantly however, there is no evidence that the tapes showed, or might have shown, anything that was helpful to the petitioner.

122.    There is no evidence of record that any surveillance equipment located anywhere was operational. Although the petition asserts that Woolwine had such equipment, such was not substantiated at the habeas hearing. The petitioner appeared to testify that some unspecified

23

footage (perhaps from the Exxon) would have shown that the victim didn't look like a kidnapping victim. What, precisely, should a kidnap victim look like? Additionally, since the victim was being held at knife point by Creathers, what, precisely was she to do? There is no evidence that such tape existed, and no evidence that there was exculpatory footage on the perhaps non-existent tape.

123. Moreover, the criticism about failing to obtain surveillance tape from the motel is ill-founded. The evidence from Creathers and Quinn were that the three partied, with or without group sex, inside a motel room. Quinn left and got food, and paid for an additional night's rental. Then she left the motel entirely. The petitioner and Quinn chased her down, and she did not return to the motel.

124. Any surveillance tape from the motel could only have corroborated what Quinn and Creathers testified to: Quinn was at the motel voluntarily and left voluntarily. The crime did not occur at the hotel.

125. Counsel was not ineffective in his cross-examination of Quinn, especially in the particular of failing to obtain and use her medical records. In fact, counsel very effectively pointed out that Quinn's account of her injuries was utterly unsubstantiated by the state, and suggested that the absence of records proved that she wasn't injured at all. The medical records themselves demonstrate that Ms. Quinn was indeed injured, requiring stitches to repair her hand.

126. On cross-examination, Ms. Quinn admitted that the petitioner never stabbed her, she had no broken bones, and was not injected with any foreign substance. In closing, petitioner's counsel noted that the photographs only showed a bandaged hand, but there was no corroborating medical evidence or photographs of the electrical burn.

24

127. The decision not to use the medical records or call a medical practitioner was not ineffective assistance of counsel. Repeating what was noted above, strategic choices and tactical decisions, with very limited exception, fall outside the scope of this inquiry and cannot be the basis of an ineffective assistance claim. *Legursky*, 195 W. Va. at 328, 465 S.E.2d at 430.

128. Strategically, petitioner's counsel kept from the jury information which corroborated the victim's story that she had bruising and cuts, one of which, at least, required stitching. The jury was left with the testimony of Ms. Quinn, who admitted she had not broken bones and was not injected with a foreign substance. The decision was objectively reasonable. The petitioner cannot satisfy either prong of *Strickland/Miller* in this regard.

129. The jury was instructed that the opening statements and closing arguments of the attorneys were not evidence. Although petitioner's counsel did state he would call one or more witnesses in his opening statement, the jury was also instructed about the burden of proof.

130. At the omnibus hearing, the petitioner asserted that there were several witnesses that he informed his attorney about and that they were not called at trial.

131. Trial counsel testified that he and/or his investigator attempted to locate and talk to every person the petitioner named. Trial counsel testified that some witnesses could not be located, some were uncooperative, and that some, who initially indicated they supported the petitioner, refused to testify on his behalf at trial.

132. One witness had a stroke and could not testify. At least two witnesses came to the court house and stated they could not testify on the petitioner's behalf. At least one witness was in jail, and his appointed attorney would not permit him to testify.

133. There is nothing to indicate that any potential witness who was named at the omnibus hearing would have testified favorably on the petitioner's behalf. None of those

25

individuals appeared at the habeas hearing. The Court is very familiar with petitioner's habeas attorney and must point out that if petitioner's habeas attorney had been able to locate any of those persons AND those persons had information favorable to the petitioner, those persons would have appeared at the habeas hearing. Their absence confirms that despite petitioner's hope or mistaken belief he had witnesses who would testify on his behalf; in fact, he did not.

134. As to the failure to present any other defense, such as diminished capacity, trial counsel testified that he discussed that with the petitioner, and the decision was made between them that such defense was not viable.

135. Without engaging in hindsight, and based upon what petitioner's counsel knew at the time, the failure to call any additional witnesses was a strategic decision, which as noted above, seldom if ever will be the basis for a finding of ineffective assistance of counsel. It appears as if, quite simply, there were no other witnesses to call. Counsel was not ineffective in this regard and this contention affords no relief.

136. The state presented photographs of bloody clothing, and the petitioner possessed no constitutional right to have the clothes, themselves, waved before the jury. Trial counsel did object to the admission of the 911 call as hearsay. The 911 call was not testimonial in nature, and therefore, the admission of that call did not violate any of petitioner's constitutional rights. Only *testimonial* out of court statements are subject to the scrutiny of the confrontation clause.

The United States Supreme Court visited the issue of "testimonial" statements in *Michigan v. Bryant*, 131 S. Ct. 1143 (2011). The analysis in *Bryant* focused on the primary purpose of the questioning as being to meet an ongoing emergency. The Court noted that the relevant inquiry is not the actual purpose of the particular parties but the purpose that reasonable participants would have had. The analysis must focus on the understanding and purpose of a

26

reasonable victim in the actual victim's circumstances. The *Bryant* Court noted that where the primary purpose of questioning is to respond to an ongoing emergency, the purpose is not to create a record for trial, and thus does not fall within the scope of the Confrontation Clause. The declarant's purpose in making the 911 call was not as a substitute for in-court testimony, but to inform the police of an ongoing emergency. Therefore, it falls outside the *Crawford* purview. Counsel objected to its admission, the objection was overruled. Counsel was not ineffective. This contention affords the petitioner no relief.

137.     These contentions, that counsel failed in cross-examination, failed to call witnesses, failed to make objections all involve strategic decisions, seldom will afford a petitioner relief in habeas corpus. The court finds that as to all these particulars, counsel's performance was objectively reasonable. That evidence was more than sufficient to convict.

138.     Trial counsel was not objectively deficient in failing to make any of the above objections, in that the questions asked, answers given, or items of evidence were clearly admissible. Petitioner fails to satisfy the deficient performance standard.

139.     The court finds that the petitioner has failed to satisfy his burden of demonstrating that any error occurred. Therefore, the doctrine of cumulative error is completely inapplicable. That standard applies both to the asserted errors committed by counsel and also to the asserted stand-alone errors at trial. Where the record a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error. Syl. Pt. 14, *State v. Foster*, 221 W.Va. 629, 656 S.E. 2d 74 (2007). The cumulative error doctrine is not applicable without legal and/or factual basis which support the individual assignments of error. *See State v. Glaspell*, 2013 WL 3184918 (W.Va. June 24,

27

2013). The cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors. *State v. Knuckles*, 196 W.Va. 416, 426, 473 S.E.2d 131, 141 (1996). Because Petitioner fails to meet his burden of establishing counsel's errors in defending his case, or the court's error at trial, the doctrine of cumulative errors does not apply.

140.     Moreover, as to the issue of effective assistance of counsel, the Court notes that the petitioner received mercy on the kidnapping offense, and was convicted of second degree robbery instead of first. Counsel's ability to persuade the jury in those regards dramatically reduced the time petitioner must spend in prison. In fact, the mercy finding will permit him, one day, to be paroled. That is because he was effectively represented at trial.

141.     In sum, the petitioner has failed to demonstrate that he is being unconstitutionally deprived of his liberty. The petitioner, in consideration of all the facts and circumstances in the underlying criminal case, clearly received that to which he was constitutionally entitled, a fair and public trial by an impartial jury of his peers.

## **RULING**

THEREFORE, based upon a thorough and complete review of the complete contents of the criminal case file in this matter, including the trial transcripts; in consideration of the testimony at the omnibus evidentiary hearing, and considering the arguments of counsel for the petitioner and the warden both at the hearing and in written submissions, it is **ORDERED** that the Petition seeking a *Writ of Habeas Corpus* be and the same is hereby **DENIED**. It is further **ORDERED** that said action be and the same is hereby **DISMISSED**. The court notes the exceptions and objections of the petitioner.

The Circuit Clerk shall send a certified copy of this Order to all counsel of record:

28

Matthew A. Victor, Esq.
VICTOR VICTOR & HELGOE LLP
P.O. Box 5160
Charleston, WV 25361

Laura Young, Esq.
Assistant Prosecuting Attorney
Kanawha County Prosecuting Attorneys
301 Virginia Street, East
Charleston, WV 25301

Honorable Charles Miller
Kanawha County Prosecuting Attorney.
301 Virginia Street, East
Charleston, WV 25301

Enter this the 13th day of February, 2017.

Tod J. Kaufman
Judge

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF CIRCUIT COURT OF SAID COUNTY
AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE COPY FROM THE RECORDS OF SAID COURT.
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS 15th
DAY OF February 2017
_____ CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA